# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

**UNITED STATES OF AMERICA**
**ex rel. JEFFREY JUDD,**

                **Relator,**

**-vs-**                                      **Case No.  3-:03-CV-241**

**DENNIS MALOY, et al.,,**

                                        **Judge Thomas M. Rose**

                **Defendants.**

---

## ENTRY AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. #46) AND TERMINATING THE CASE

---

This matter arises from the employment and subsequent termination of Relator Jeffrey Judd ("Judd") by Defendant South Community, Inc. ("SCI"). Defendant Dennis Maloy ("Maloy") was at all times relevant the Chief Executive Officer of SCI. The Trustees of SCI (the "Board") and Gerre Wood ("Wood"), SCI's human resources director, are also named Defendants.[1]

Now before the Court is Defendants' Motion for Summary Judgment. (Doc. #46.) This motion is now fully briefed and ripe for decision. Brief procedural and factual backgrounds will first be set forth followed by the standard of review for motions for summary judgment and an analysis of each Count of Judd's Amended Complaint.

## PROCEDURAL BACKGROUND

---

[1]SCI, Maloy, the Board and Wood are collectively referred to herein as the "Defendants."

The original complaint in this case was filed under seal on July 2, 2003, and a copy was served on the United States Department of Justice. The Department of Justice declined to intervene. The original complaint was then served on the Defendants and Judd proceeded with this action as the qui tam Relator.

Judd's original complaint consisted of seven Counts. Pursuant to a motion, three Counts were dismissed by the Court. Then, on February 15, 2006, Judd filed his First Amended Complaint.

Judd's First Amended Complaint asserts five Counts. Count I alleges that the Defendants made knowingly false certifications/billings/claims involving payments for Medicaid and Medicare in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq. Count II alleges that the Defendants knowingly and falsely represented MACSIS, a payer of last resort, as a primary payer in violation of the FCA. Count III alleges that the Defendants conspired to defraud the United States in violation of the FCA. Count IV alleges that Maloy and Wood retaliated against him in violation of the FCA. Finally, Count V alleges that the Defendants engaged in the spoilation of evidence.

## FACTUAL BACKGROUND

For purposes of deciding a summary judgment motion, facts are to be considered in a light most favorable to the non moving party. However, the following facts are generally undisputed in this matter and are provided as background.

SCI is an Ohio nonprofit provider of health care and counseling services. SCI gets paid, in part, for its services by being a recipient and/or grantee of federal funds, including Medicaid and Medicare funds, administered by and passed through the Ohio Department of Mental Health

(ODMH) and the Alcohol, Drug Addiction and Mental Health Services Board (ADAMHS). The ADAMHS Board referred to in this matter is responsible for planning, funding, monitoring and evaluating alcohol, drug addiction, and mental health services for the citizens of Montgomery County, Ohio.

Judd was employed by SCI from January 3, 1996 through October 25, 2002. At the time his employment was terminated, Judd held the position of Chief Operating Officer ("COO"). In addition to supervising the office, Judd's duties included preparing budget and financial reports, preparing budget modifications and approving expenditures.

Maloy was the Chief Executive Officer ("CEO") of SCI and Judd reported directly to Maloy. Maloy issued Judd a letter, dated October 24, 2002, that terminated Judd's employment and cited breach of trust as the reason for the termination.

As CEO of SCI, Maloy was responsible for the overall day-to-day management of the organization and its programs, finances and development. Maloy reported to the Board. Having set forth the undisputed facts in this matter, the analysis turns to the standard of review for motions for summary judgment.

## STANDARD OF REVIEW

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and the associated caselaw. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not

decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, §2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not …obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted. Fed. R. Civ. P. 56(c).

Judd's First Amended Complaint is "verified." "Although statements in a verified complaint may function as the equivalent of affidavit statements for purposes of summary judgment …affidavit statements must be based on personal knowledge." *Weberg v. Franks*, 229 F.3d 514, 516 n.13 (6th Cir. 2000). Moreover, "an affidavit not based on personal knowledge does not create issue of fact precluding summary judgment." *Erickson v. Farmland Industries, Inc.*, 271 F.3d 718, 728 (8th Cir. 2001). Therefore, a statement in a verified complaint that is not based upon personal knowledge does not create an issue of fact precluding summary judgment.

In addition to applying the federal procedural standard for motions for summary judgment, as a federal court located in Ohio exercising diversity jurisdiction, this Court must apply Ohio substantive law unless the law of another state is specifically implicated. *Hisrich v. Volvo Cars of N. America, Inc.*, 226 F.3d 445, 449 (6th Cir. 2000). This Court must apply the

substantive law of Ohio "'in accordance with the then-controlling decision of the highest court of the state.'" *Imperial Hotels Corp. v. Dore*, 257 F.3d 615, 620 (6th Cir. 2001) (quoting *Pedigo v. UNUM Life Ins. Co.*, 145 F.3d 804, 808 (6th Cir. 1998)).

To the extent that the highest court in Ohio has not addressed the issue presented, this Court must ascertain from all available data, including the decisional law of Ohio's lower courts, what Ohio's highest court would decide if faced with the issue. *Id.; Bailey v. V. & O. Press Co., Inc.*, 770 F.2d 601, 604 (6th Cir. 1985). Finally, where Ohio's highest court has not addressed the issue presented, a federal court may not disregard a decision of an Ohio appellate court on point unless the federal court is convinced by other persuasive data that the highest court of Ohio would decide otherwise. *Puckett v. Tennessee Eastman Co.*, 889 F.2d 1481, 1485 (6th Cir. 1989). The analysis now turns to the Counts set forth in Judd's First Amended Complaint.

## COUNTS I & II: FALSE CLAIMS IN VIOLATION OF THE FCA

Counts I and II of Judd's First Amended Complaint allege that the Defendants violated the FCA when they made knowingly false certifications/billings/claims involving payments for Medicaid and Medicare and that the Defendants knowingly and falsely represented the Multi-Agency Community Services Information System (" MACSIS")[2], a payer of last resort, as a primary payer in violation of the FCA. Counts I and II are combined into four allegations by Judd and will, therefore, be treated here as four allegations. The Defendants assert that Judd's allegations do not amount to fraud and that he has no evidence that they presented a materially false claim that one or more of them knew was false.

---

[2]MACSIS is the main billing, tracking, data collection and payment system for the behavioral health care field in Ohio that was in use during the relevant time period.

The FCA was originally enacted in 1863 "to combat rampant fraud in Civil War defense contracts." *United States ex rel. A+ Homecare, Inc. v. Medshares Mangement Group, Inc.*, 400 F.3d 428, 444 (6th Cir. 2005)(quoting S.Rep. No. 99-345, at 8 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5273), *cert. denied*, 126 S.Ct. 797 (2005). The FCA was amended by Congress in 1988 "to enhance the Government's ability to recover losses sustained as a result of fraud against the Government." *Id.*(quoting S.Rep. No. 99-345 at 1, 1986 U.S.C.C.A.N. at 5266). This amendment expanded the FCA by eliminating the showing of specific intent to defraud, by raising the civil penalties, by increasing the Government's award to treble damages and by imposing liability for a reverse false claim. *Id.*

The FCA, as it now stands, prohibits knowingly presenting or causing to be presented a false or fraudulent claim for payment or approval. 31 U.S.C.A. § 3729(a)(1). The FCA also prohibits knowingly making, using or causing to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Government. 31 U.S.C.A. § 3729(a)(2).

Several words and phrases inherent in the FCA have been further defined by statute and by the courts including what is a claim, when a person acts knowingly and the materiality required of the false statement or conduct. First, a claim is defined as "any request or demand for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded. 31 U.S.C.A. § 3729(c). A request or demand is also a claim under the FCA if the Government will reimburse such contractor, grantee or other recipient for any portion of the money or property which is requested or demanded." Id.

Second, a person knowingly acts with regard to information when that person: "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C.A. § 3729 (b). Further, "[n]o proof of specific intent to defraud is required." Id.

Third, regarding materiality, liability is not incurred merely because a false statement is included within a claim. *A+ Homecare*, 400 F.3d at 443. To incur liability, the false statement must be material to a false or fraudulent claim. *Id.* "In general, a false statement is material if it has natural tendency to influence or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *Id.* at 445 (quoting *Neder v. United States*, 527 U.S. 1, 16 (1999)). The "natural tendency" standard focuses on the potential effect of the false statement when it is made and not on the actual effect of the false statement. *Id.* The analysis next turns to Judd's specific false-claim allegations.

<u>Judd's First Alleged False Claim</u>

Judd's first allegation relates to duplicate billing to Medicare and Medicaid through MACSIS. Judd alleges that Maloy was charging more than 100% of some employees' effort, including his own, to various federally funded grants/claims. He also alleges that SCI was charging more employee time to grants and/or claims than was actually spent. Finally, Judd alleges that the Defendants disregarded their contract with ADAMHS and/or ADAMHS's directives regarding billing primary payers first and instead billed MACSIS, a payer of last resort, as a primary payer. In sum, Judd alleges that the Defendants omitted facts regarding primary payers and other support while at the same time seeking payment and alleging the

billings were true, complete and accurate, while the United States funded and made such payments.

The Defendants argue that Judd cannot demonstrate that a material false claim was made because he repeatedly admits that he does not know whether SCI was entitled to the funds it received from any source for allegedly fraudulent claims submitted. Judd testified in his deposition that he learned from Teresa Voskul (nee Holland)("Voskul"), a former SCI employee that he had supervised in the billing department, that SCI was receiving payments from Medicare for services provided and, when attempting to apply such payments to client accounts, it appeared that payment for services already had been made by Medicaid. (Judd Dep. 17-18, Oct. 20, 2005.) Judd did not know why this was occurring but he brought it to Maloy's attention. (Id. 18, 134.) Judd also testified that he does not know if, when a credit balance appeared on a client's account, a funding source was ever "paid back." (Id. 134-37.)

The Defendants also identify the deposition statements of nonparty witnesses who state without equivocation that they never came to know or suspect that SCI was engaging in overbilling or double-billing for services provided or was otherwise submitting false claims to the federal government. John Harvey ("Harvey"), an independent certified public accountant who conducts annual financial audits of SCI's operations for ADAMHS, was aware of the issue. (Harvey Dep. 13-14, 29, Jan 30, 2006.)  However, according to Harvey, the issue was addressed and Harvey never reported or was aware of any overbillings or double billings by SCI. (Id. 29, 94-95.) Also, Joe Szoke, who is the executive director of ADAMHS, testified that he was unaware of any billing improprieties by SCI that resulted in a suspension, reduction or elimination of funding to SCI and that he was unaware of any fraudulent billing by SCI. (Szoke

Dep. 42-47, Jan 18, 2006.)   Finally, Beverly Kirstein Jones-Arthur ("Jones-Arthur"), the

ADAMHS Director of Behavioral Health Operations, testified that she was not aware of any

false claims submitted by SCI. (Jones-Arthur Dep. 66, Jan. 18, 2006.)

Judd's response to the Defendants' arguments that he could not demonstrate a false claim

was made and that others familiar with SCI and the billing systems, including the independent

auditor, were aware of no false claims being made is to refer to the deposition testimony of

various individuals.

First, Judd. His deposition testimony is that he was told by Voskul that, when she was

applying Medicare payments to client's accounts, the payment screen showed that the client had

already been paid in full. (Judd Dep. 17.) This was verified to Judd by Thomas Couvion, SCI's

Director of Information Services. (Id. 18.)

Then, Voskul. Prior to her voluntary departure on August 26, 2005, she worked at SCI as

a Medicare/Medicaid Billing Specialist. (Voskul Dep. 7, Jan. 30, 2006.) At her deposition,

Voskul testified that duplicate billings had occurred when SCI received Medicare advice

statements of payments for services performed that had already been billed and paid by Medicaid

through MASCIS. (Id. 18-19.) Voskul further testified that SCI billed Medicare and Medicaid

simultaneously with the understanding that the agency would reconcile the duplicate payments at

the end of the year. (Id. 24.) Both Medicare and Medicaid were billed simultaneously because

the computer system being used was set up to bill both at the same time. (Id. 32.) Voskul did not

think the duplicate billing was deliberate but she does think that the outcome was not handled

properly. (Id. 27-28.) According to Voskul, the overpayments were never reimbursed and no

reconciliation occurred at the end of the year. (Id. 22-24, 28, 40.) Finally, Voskul testified that

she believed that SCI committed Medicaid or Medicare fraud because SCI was collecting more and not returning back what it should. (Id. 37-38.)

Finally, Debra E. Scott ("Scott"). Scott, who was formerly employed at SCI as an Insurance Specialist III, attests that she observed over billing or "double dipping" through MASCIS in the area of treatment foster care. (Scott Aff. ¶17.) Also, to the best of her knowledge, the overpayments she observed had not been rectified when she was laid off in June 2003. (Id. ¶ 21.)

After presenting testimony regarding the alleged over billing or double billing, Judd attempts to discredit the deposition testimony of Harvey, Szoke and Jones-Arthur. These individuals testified that they saw no fraud being committed by SCI.

First, Harvey. Harvey indicated that, if there was a material risk of fraud, the audits he conducted would have uncovered it. (Harvey Dep. 10-11.) He further testified that "there were tests specifically designed to determine whether or not MACSIS and Medicaid billings were appropriate and there were no findings on those audits. (Id. 30.) Specifically, his audit had the capability of determining whether or not the clients billed through MASCIS were eligible or ineligible. (Id. 77.) However, Harvey only looked at samples[3] and did not evaluate whether all of the clients that were being billed through MASCIS were eligible. (Id. 78.)

Judd notes that Harvey testified that he did not conduct a fraud audit. (Id. 96.) Harvey also testified that there could be over billings or duplicate billings in such amounts where the

---

[3]The sample was selected based on Ohio Department of Mental Health standards and was intended to represent the population. (Harvey Dep. 79.)

audit he conducts would not detect them. (Id. 99-100.) However, Harvey also testified that any audit should be designed in a matter that it would detect material fraud. (Id.)

Judd also identifies concerns expressed by Harvey regarding the availability of sufficient competent personnel at SCI to oversee the financial reporting. (Id. 49-50.) Harvey thought Medicaid and Medicare revenue was being lost due to lack of oversight. (Id. 50.) Finally regarding Harvey, Scott attests that she was not aware of Harvey auditing to see if services for clients in the treatment foster care program were being correctly billed. (Scott Aff. ¶ 27-29.)

Next, Szoke. Judd identifies testimony by Szoke that he was concerned about the financial condition of SCI. (Szoke Dep. 17-8.) Szoke also felt that Maloy, as a member of management at SCI, was responsible for the deteriorated financial condition. (Id. 25, 34.)

Finally, Jones-Arthur. At her deposition, Jones-Arthur testified that the financial crisis at SCI put SCI at the risk of not being able to fulfill its contract with ADAMHS. (Jones-Arthur Dep. 17-18.) Jones-Arthur believed that certain services and programs at SCI that were not funded by ADAMHS were creating a potentially negative impact on the services contracted by ADAMHS. (Id. 20.)

Judd then offers one final argument in support of his allegation that the Defendants engaged in submitting false claims to the federal government regarding Medicare and Medicaid. Judd submits documents showing that, on July 11, 2006, SCI presented a $233,196.54 check to ADAMHS as repayment for billing discrepancies occurring during the fiscal years 2003, 2004 and 2005. The Defendants respond that the documents submitted by Judd are not authenticated, which they are not, and that they reference events allegedly occurring long after Judd's

employment was terminated and relate to a computer billing program that was not utilized by Defendants during the time period pertinent to this case.

In sum, Judd has presented allegations by himself and two other individuals, Voskul and Scott, that the Defendants engaged in over billing or double billing for services that were reimbursed by the government. Yet the Defendants have presented the testimony of three non-party individuals, Harvey, Szoke and Jones-Arthur, that the Defendants did not commit material fraud.

Direct evidence of fraud to support general, unsupported allegations presented by Judd is lacking. Judd has not brought forward any specific evidence showing that the Defendants submitted a false claim to the government beyond the general, unsupported assertions by himself, Voskul and Scott.[4]

<u>Judd's Second Alleged False Claim</u>

Judd's second alleged false claim is "that Jones-Arthur issued a directive on behalf of the ADAMHS Board stating that the therapy services providers were in no way to bill MACSIS for clients enrolled in the Adult Parole Authority[5] ("APA") Program." Presumably, Judd is alleging that the Defendants billed APA Program services through MASCIS that were ultimately paid by ADAMHS when ADAMHS had no responsibility for paying for the APA Program services.

The Defendants respond by pointing to the aforementioned testimony by the three non-party witnesses who state without equivocation that they never came to know or suspect that SCI

[4]Unsupported assertions are not enough to defeat summary judgment particularly when extensive discovery did not reveal more persuasive, direct evidence. *Wilson v. Wells Aluminum Corp.*, 107 F.3d 12 at *6 (6th Cir. 1997).

[5]The APA Program provides outpatient therapy services for men on parole for sex offenses.

was engaging in overbilling or double-billing for services provided or was otherwise submitting false claims to the federal government. The Defendants also point to Judd's testimony that he did not know if SCI was entitled to the funds it received through MASCIS from ADAHMS for the APA Program. (Judd Dep. 143.) Further, Voskul testified that she did not have any concern with the APA billing and that some APA clients were eligible for Medicaid benefits. (Voskul Dep. 24-25.)

Judd's only response is that he believed that the costs to run the APA program were at least $120,000 per year, the contract or grant was capped at $62, 500 and the remainder was made up by billing MACSIS clients in contravention to Jones-Arthur's directive. (Judd Dep. 19.) However, as before, Judd has presented no direct evidence of fraud to support his general, unsupported assertions.

<u>Judd's Third Alleged False Claim</u>

Judd's third alleged false claim is that the Defendants billed ADAMHS for services provided to managed care clients when ADAMHS was not to be the payer for those services. According to Judd, a "system" developed to bill MACSIS and not "primary payers" because MACSIS was more likely to pay in full and on a timely basis than private insurance companies. (Judd Dep. 19-20.)

The Defendants again rely on the aforementioned testimony by the three non-party witnesses who state without equivocation that they never came to know or suspect that SCI was engaging in overbilling or double-billing for services provided or was otherwise submitting false claims to the federal government. In addition, the Defendants cite Judd's testimony that he does

not know whether SCI could have been entitled to receive funds through MACSIS for the managed care program. (Judd Dep. 143.)

In response Judd repeats his general, unsupported assertions. However, he offers no direct evidence of fraud to support his general, unsupported assertions.

<u>Judd's Fourth Alleged False Claim</u>

Judd's fourth alleged false claim is that the Defendants improperly completed the financial authorization records ("FAR's") and the financial exception worksheets ("FEW's") for clients of the Youth Partial Hospitalization ("YPH") Program. The Defendants respond that Judd's allegations regarding the YPH Program do not amount to fraud because he admits his lack of understanding of why exceptions were made to render families eligible for Medicaid benefits that he thought were ineligible (Judd Dep. 154-58), that he admits that the time reporting discrepancies he complains of are not fraudulent billing (Id. 170) and that he does not know if group therapy and partial hospitalization are essentially the same service, but if they are, SCI should not have been billing them separately. (Id. 175.)

In response Judd repeats his general, unsupported assertions. However, he offers no direct evidence of fraud to support his general, unsupported assertions.

<u>Summary of Alleged FCA Violations</u>

In sum, Judd has presented general, unsupported allegations by himself and two individuals, Voskul and Scott, that the Defendants engaged in over billing or double billing for services that were reimbursed by the government. Yet, the Defendants have presented the testimony of three non-party individuals, Harvey, Szoke and Jones-Arthur, that the Defendants did not commit material fraud.

What is lacking is direct evidence of fraud to support the general, unsupported allegations. Judd has not brought forward any specific evidence showing that the Defendants submitted a false claim to the government beyond the general, unsupported assertions by himself, Voskul and Scott. Therefore, no reasonable juror could find that the Defendants submitted a false claim to the federal government. There are no genuine issues of material fact and the Defendants are entitled to judgment as a matter of law on Counts I and II of Judd's First Amended Complaint for violations of the FCA.

## COUNT III: CONSPIRACY TO DEFRAUD

In Count III of Judd's First Amended Complaint, he alleges that the Defendants conspired to defraud the United States by knowingly submitting false claims in violation of the FCA. Section 3729(a)(3) of the FCA establishes liability for those who participate in a conspiracy to defraud the government by getting a false or fraudulent claim paid. 31 U.S.C.A. § 3729(a)(3). To establish a conspiracy under Section 3729(a)(3), a plaintiff must show (1) that there was a single plan to get a false claim paid, (2) that the alleged coconspirators shared in the general conspiratorial objective to get a false claim paid, and (3) that one or more conspirators performed an overt act in furtherance of the conspiracy to get a false claim paid. *United States v. Murphy*, 937 F.2d 1032, 1038-39 (6th Cir. 1991).

The Defendants argue that there can be no liability for a conspiracy to defraud the federal government because there is no evidence that a false claim was submitted. Judd responds by identifying deposition testimony from which he concludes that Maloy and the Board "had concrete knowledge and engaged in a conspiracy to ignore and otherwise disregard the fiduciary

duties and due diligence to address the financial improprieties that were the substance of [his] claims…."

Even if Judd's conclusion regarding Maloy and the Board's management of SCI's finances were completely accurate, these alleged actions fall short of the submission of a false claim. Again, Judd has presented no direct evidence of the submission of a false claim to the federal government to support the general, unsupported allegations. Therefore, no reasonable juror could find that the Defendants engaged in a conspiracy to defraud the government by getting a false or fraudulent claim paid. There are no genuine issues of material fact and the Defendants are entitled to judgment as a matter of law on Count III of Judd's First Amended Complaint for conspiracy in violation of the FCA.

## COUNT IV: RETALIATION

Count IV of Judd's First Amended Complaint alleges that the Defendants retaliated against him in violation of the whistleblower protections provided by the FCA. "The FCA protects "whistleblowers" who pursue or investigate or otherwise contribute to a qui tam action, exposing fraud against the United States government. " *McKenzie v. Bellsouth Telecommunications, Inc.*, 219 F.3d 508, 513 (6th Cir. 2000)(citing 31 U.S.C. §§ 3729-3730), *cert. denied*, 522 U.S. 1077 (1998). To protect whistleblowers, the FCA prohibits an employer from discriminating against an employee in his or her terms and conditions of employment because of lawful acts done by the employee in furtherance of an action under the FCA. 31 U.S.C.A. § 3730(h). Under the FCA whistleblower protection, Congress intended to protect the investigation of fraud as well as reports of fraud. *Neal v. Honeywell, Inc.*, 33 F.3d 860, 865 (7th Cir. 1994).

To establish an action under this whistleblower protection, a plaintiff must prove (1) that he or she was engaged in a protected activity, (2) that his or her employer knew that he or she was engaged in the protected activity, and that (3) the employer discharged or otherwise discriminated against the plaintiff as a result of the protected activity. *McKenzie*, 219 F.3d at 514.

Protected activity is activity done in furtherance of an action under the FCA, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed. *Id.* (citing 31 U.S.C. § 3730(h)). The activity must relate to exposing fraud or involvement with a false claim disclosure. *Id.* at 515-16. Further, while the words "illegality" or "fraud" need not be used, the activity must be sufficiently connected to a false claims action. *United States ex rel. Yesudian v. Howard University*, 153 F.3d 731, 740 (D.C.Cir. 1998).

However, reporting alleged wrongdoing to supervisors is not sufficient to meet the requirement for protected activity. *McKenzie,* 219 F.3d at 515-16. Also, mere dissatisfaction with one's treatment on the job is not enough. *Yesudian*, 153 F.3d at 740. Nor is an employee's investigation of nothing more than the employer's non-compliance with federal or state regulations. *Id.*

In this case, the Defendants, citing specific Rule 56 evidence, argue that Judd cannot support a whistleblower claim. Therefore, each of the elements of a whistleblower claim will next be addressed.

<u>Engaged In Protected Activity</u>

Judd identifies two protected activities in which he engaged. The first is whistleblowing to ADAMHS corporate officials regarding the Defendant's fraudulent activities. The second is the duplicate billing that he reported to Maloy.

First, the whistleblowing to ADAMHS corporate officials allegedly took place at a meeting that Judd had with Szoke, Jones-Arthur and Marion Jackson in May of 2002. (Judd Dep. 94-95.) The meeting was called by Judd and took place in Szoke's office. (Id. at 95.) During this meeting, Judd did not allege or complain of fraud. (Judd Dep. 95; Jones-Arthur Dep. 48-50; Szoke Dep. 29,32, 37-38.) Rather, he expressed concern about Maloy's business decisions at SCI, his disagreement with some of those decisions and how they may impact the financial health of SCI. (Jones-Arthur Dep. 48-50; Szoke Dep. 29,32, 37-38.) Since Judd did not indicate that fraudulent activity was taking place but merely complained about management and management decisions, he was not whistleblowing for purposes of the FCA at the ADAMHS meeting.

Second, Judd, instead of going directly to Maloy, arranged for Voskul and Couvion to present the duplicate billing issue to Maloy. (Judd Dep. 39-41.) Maloy, according to Judd, was responsible for the finance department and for making a decision about how to pay the money back to Medicare and Medicaid. (Id. 92.)

Judd continued to inform Maloy from January 2001 until the time his employment was terminated in November 2002 that the duplicate billing problem was continuing to occur. (Id. 134.) However, Judd does not know if the funds were paid back to Medicaid or Medicare. (Id. 136.) Further, as determined hereinbefore, he has presented no evidence that they were not.

Judd also does not remember if he specifically used the word fraud  or similar words when he reported the duplicate billings to Maloy. (Id. 213.)

Maloy later acknowledged that there were duplicate billings and that Judd had accused him of Medicaid fraud. (Am. Compl. Ex. C.) However, this acknowledgment occurred in a response to Judd's grievance that is dated after Judd was terminated. (Id.)

Investigating SCI's non compliance with billing regulations, alone, is not protected activity. Duplicate billing in and of itself is not necessarily material fraudulent activity forbidden by the FCA, particularly if any material double billing is corrected. Judd does not know if the duplicate billing was corrected and has been unable to present evidence that the duplicate billing was material to a false or fraudulent claim made to the federal government. Therefore, he has not produced evidence that presenting the duplicate billing issue to Maloy was a protected activity.

<u>Employer Knew of the Protected Activity</u>

Judd argues that Maloy knew he was engaged in protected activity because he repeatedly brought the duplicate billing issue to Maloy's attention. (Id. 18.) However, raising the duplicate billing issue, as determined above, is not protected activity.

Judd also argues that SCI knew he was engaged in protected activity because he took his concerns to the ADAMHS Board. However, as determined above, Judd did not engage in protected activity when he met with the ADAMHS Board. Therefore, Judd has not produced evidence that any of the Defendants were aware that he was engaged in alleged protected activity.

<u>Employer Discriminated as a Result of the Protected Activity</u>

The termination of Judd's employment is the type of adverse employment action contemplated by the FCA whistleblower provision. However, Judd has not produced evidence that the termination of his employment was a result of protected activity because he has not produced evidence that he was engaged in protected activity prior to his termination and that any of the Defendants were aware that he was engaged in alleged protected activity.

Conclusion

Judd has not presented evidence to satisfy any of the elements of a whistleblower claim. The evidence, when viewed in a light most favorable to Judd, does not show that Judd is entitled to FCA whistleblower protection. Therefore, there are no genuine issues of material fact and the Defendants are entitled to judgment as a matter of law on Count IV of Judd's First Amended Complaint for retaliation.

**COUNT V: SPOILATION OF EVIDENCE**

Count V of Judd's First Amended Complaint alleges that the Defendants altered or destroyed evidence that he needed to prepare his case. This claim, as all Parties agree, is governed by Ohio law.

"Spoilation of evidence" is defined as the intentional destruction of evidence that is presumed to be unfavorable to the party responsible for its destruction. *United States v. Copeland*, 321 F.3d 582, 597 (6th Cir. 2003). Inherent in this definition is the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation. *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003). Further, "intentional destruction" is defined as the removal of evidence for the purpose of rendering it inaccessible or useless to

another party. *Nationwide Mutual Fire Insurance Co. v. Ford Motor Co.*, 174 F.3d 801, (6th Cir. 1999).

Under Ohio law, the elements of a spoliation claim are: (1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of the defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case, (4) disruption of the plaintiff's case, and (5) damages proximately caused by the defendant's acts. *Herlik v. Continental Airlines, Inc.*, Case No. 04-3790, 2005 U.S. App. LEXIS 21784 at *19 (6th Cir. Oct. 4, 2005). If the plaintiff shows that the defendant willfully destroyed evidence, the burden shifts to the defendant to persuade the trial court that the plaintiff was not prejudiced. by the destruction of evidence. *Bright v. Ford Motor Co.*, 578 N.E.2d 547, 550 (Ohio Ct. App. 1990).[6]

The Defendants concede, for purposes of their Motion for Summary Judgment, that Judd could establish the first two elements of a spoliation claim. The third element will next be analyzed.

## Willful Destruction By Defendants Designed To Disrupt Judd's Case

Judd's makes three allegations in support of his spoliation claim. The first allegation is based upon Voskul's deposition testimony. Voskul was asked during her deposition about the location of certain documents that Judd had earlier requested from the Defendants and had not received. (Voskul Dep. 28-31.) She testified that some may still exist on SCI's computer network

---

[6]Pursuant to a show cause order, Judd's Counsel asserted that the analysis in his Memorandum Contra is "very involved" and required him to go beyond the twenty-page limitation to a total of thirty-five pages. However, at least one of those pages, specifically page 33, includes a significant amount of information that is repeated verbatim from a prior paragraph.

despite a computer crash before she left. (Id.) She believed others were boxed up when she left

in August 2005, labeled in a certain fashion, and placed on a storage floor. (Id.)  Voskul also

testified that she had no knowledge of any SCI employee destroying or shredding documents.

(Id. 43.)

Shortly after and based upon Voskul's deposition testimony, SCI located and made

available for inspection by Judd's Counsel the documents that Voskul testified were in storage.

(Carol Smerz Aff. ¶16 July 13, 2006.) Carol Smerz, SCI's current co-CEO, affirmed that she

reviewed Judd's Requests for Production in detail and "spent many hours" herself and directed

others searching for and examining items that might be responsive to those requests. (Id. ¶¶ 14-

15) She also categorically denies that SCI has intentionally destroyed records relating to Judd's

case. (Id. ¶ 13.) Therefore, Judd has not presented evidence, through Voskul's testimony, that the

Defendants wilfully destroyed evidence.

Judd's second allegation is found in the Affidavit that he completed on January 18, 2006.

In this Affidavit, Judd alleges that, after reviewing the documentation provided by SCI, "I have

discovered that the majority of key documents supportive to my false claims case are either a)

absent or b) inadequately incomplete. (Jeffrey M. Judd Aff. ¶ 2 Jan. 18, 2006.) He then identifies

specific documentation requests that were not satisfied and indicates where the documents were

kept when his employment was terminated in October 2002. To this the Defendants respond that

some of the information referenced in Judd's Affidavit either already had been produced, had

never been requested, was in the possession of a non-party, or was the subject of a Motion for

Protective Order involving access to documents and not the destruction thereof. Now, although

he complains that documents that were made available for inspection were not responsive, Judd has not identified a single piece of evidence that was destroyed.

The allegations in Judd's Affidavit regarding document requests that were not satisfied do not rise to the level of allegations of spoilation of evidence. If they did, however, they are unsupported allegations.

Judd's third allegation is that, pursuant to Ohio Administrative Code ("OAC") 5122-27-09, SCI was required to maintain backup billing tapes or data and that SCI has maintained that they do not have any backup tapes. OAC 5122-27-09 relates to the security of clinical records systems in Ohio's healthcare agencies and, on its face, does not address billing records. Also, it did not become effective until September 4, 2003, after the end of the time period relevant to Judd's complaint. Thus, Judd's reference to this OAC is unpersuasive.

<u>Conclusion</u>

When challenged, Judd has presented no evidence that the Defendants willfully destroyed evidence relating to his case. Therefore, there are no genuine issues of material fact and the Defendants are entitled to judgment as a matter of law on Count V of Judd's First Amended Complaint for spoilation of evidence.

**SUMMARY**

Judd has produced no evidence to support the general, unsupported allegations of himself and two other individuals that the Defendants submitted false claims to the federal government. Also, since he has produced no evidence of false claims being submitted, he cannot show that there was a conspiracy to submit false claims.

-24-

Judd has presented no evidence that he engaged in activity protected by the FCA whistleblower provisions or that the Defendants knew that he was engaged in alleged protected activity. He is, therefore, not entitled to the protection afforded by the FCA whistleblower provisions.

Finally, failing to find any evidence of false claims, Judd alleged that the Defendants destroyed relevant evidence. However, Judd has not identified one piece of evidence that was destroyed.

In sum, there are no genuine issues of material fact and the Defendants are entitled to judgment as a matter of law on all Counts of Judd's First Amended Complaint. The Defendants' Motion for Summary Judgment is, therefore, GRANTED. Judd's First Amended Complaint is DISMISSED. The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

**DONE** and **ORDERED** in Dayton, Ohio, this Sixth day of September, 2006.

s/Thomas M. Rose

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record